UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

STEVEN LATHEL JONES,

      Plaintiff,

vs.                          CASE NO.: 3:09-cv-1150-J-32TEM

JOHN RUTHERFORD, et al.,

      Defendants.

_____/

## DEFENDANT DAVID KING'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT

Defendant, DAVID KING, pursuant to Fed.R.Civ.P. 56, hereby moves this Court for the entry of summary judgment. As set forth more fully in the accompanying memorandum of law, the Plaintiff has failed to establish that there exist genuine issues of material fact that should be decided at trial as required by Fed.R.Civ.P. 56 (c)(2) as to this Defendant, his role in the actions complained of and his ability to intervene. Therefore, as a matter of law, Defendant King is entitled to summary judgment.

## STATEMENT OF UNDISPUTED FACTS

Defendant, David King, offers the following undisputed facts in support of this Motion for Summary Judgment, taken from Plaintiff's deposition testimony and the Affidavit of David King:

1.      In October 2007, David King was a deputy sheriff assigned as an investigator with the Nassau County Sheriff's Office. In that assignment he assisted in the investigation of a crime alleged to have involved the Plaintiff.  King was made aware that Plaintiff was suspected of having committed the crimes of sexual battery, aggravated battery and burglary with assault or battery. (Affidavit of David King, hereafter "King": ¶ 2 )

2.     In the early stages of the investigation King made contact with Plaintiff, Steven Jones, and obtained from him a DNA sample on or about September 24, 2007. (King: ¶ 3) (Deposition of Steven Jones, hereafter "Jones", p. 54 - 55)

3.     King subsequently was advised by the lead investigator that the DNA sample provided by Plaintiff matched DNA found at the scene of the crime. As a result, King became aware that a warrant was issued for Plaintiff's arrest for the crimes of sexual battery, aggravated battery and burglary with assault or battery. (King: ¶ 4)

4.     After numerous attempts were made to locate Plaintiff, information was obtained on October 23, 2007, that Plaintiff was living with an individual named Earnest Day in the Jacksonville area at 4523 Hunt Street. As a result, King accompanied other individuals associated with the Nassau County Sheriff's Office to locate and possibly arrest Plaintiff on the warrant that had been issued. Due to the nature of the crimes Plaintiff was suspected of having committed, he was considered to be possibly violent or dangerous. (King: ¶ 5)

5.     At the Hunt Street address King made contact with Earnest Day, who told him that Plaintiff was inside the residence, which was a mobile home. At that time Jacksonville Sheriff's Office (JSO) dispatch was notified and the assistance of deputy sheriffs from the JSO was requested in order to serve the arrest warrant for Plaintiff in Duval County. Approximately ten to fifteen minutes later, officers with the Jacksonville Sheriff's Office arrived on the scene and established a perimeter around the residence. (King: ¶ 6)

6.     Plaintiff could not be located in the home and King was then told by Mr. Day that Plaintiff had gone under the house through a hole in the floor. As a result, the law enforcement

officers present surrounded the house. With the permission of the owner, King entered the house, located a child and evacuated the child from the home. (King: ¶ 7)

7.     A K-9 unit from the JSO had arrived at the scene after Plaintiff was located under the home. (Jones, p. 57 – 58)  Plaintiff was repeatedly ordered to come out from under the home and surrender. Plaintiff maneuvered back and forth under the home in an effort to escape. (King: ¶ 8) (Declaration of C.W. Wilke & Exhibit A [Doc. 43-1], hereafter "Wilke").

8.     Officers with the JSO deployed their K-9 dog in order to apprehend the Plaintiff. King did not participate in the decision in this regard, did not give any orders in this regard and did not maintain any degree of control over the K-9 dog. (King: ¶¶ 9, 11) (Jones, p. 62 – 63, 67 – 68, 71– 72, 76 – 77, 124) (Wilke)

9.     As the K-9 dog apprehended the Plaintiff, he was bitten by the dog. During this time, King was not in a position to physically restrain the K-9 dog, to issue any order to the dog to cease its efforts at apprehension or to otherwise stop the efforts at apprehension being engaged in by the JSO law enforcement officers or their K-9 dog. (Jones, *Id.*)  Based upon King's (and Jones') past experience with K-9 dogs, they will not obey commands issues by any person other than their handler who, in this instance, was a law enforcement officer from the Jacksonville Sheriff's Office. (King ¶ 11) (Jones, p. 69)  As such, there was no reason for King to issue any command to the dog. Based upon the location of the Plaintiff and the dog under the home and the limited amount of space in that location, King was not in a position to place himself between the Plaintiff and the dog to attempt to prevent the dog from biting the Plaintiff, even if King did perceive the use of force as being excessive. (*Id.*)

3

10.     Because King had known Plaintiff from having grown up with him in Nassau County, King approached him and was able to persuade him to come out from under the residence. (King ¶ 12) (Jones, p. 62 – 63, 74)  Once Plaintiff came out from under the trailer, he was restrained.  King did not observe Plaintiff being bitten by the K-9 dog after he surrendered and came out from under the mobile home, and King did not observe or participate in any use of force that occurred after he surrendered and came out from under the mobile home. (King: ¶ 12) (Jones, p. 71 – 72, 76- 77)

11.     Medical assistance was called to the scene and Plaintiff was provided treatment by the EMT personnel who responded. (Declaration of John Kvistad)  Plaintiff subsequently refused additional treatment or transport to the ER. (King: ¶ 13) (Wilke).  Plaintiff received medical care from the Duval County Jail for his wounds. (Affidavit of Max Solano, M.D. [Doc. 43-2])

12.     Thereafter, Plaintiff refused to speak with anyone besides King with regard to the charges for which he was arrested.  Plaintiff was escorted by the Jacksonville Sheriff's Office officers to their facility and was brought from the patrol vehicle that transported him into the office of the JSO.  The video recording of the interview shows that he and King engaged in an approximately three hour conversation. (Video recording of interview of Steven Jones, hereinafter "Video")  During this conversation, Plaintiff did not request medical treatment, demonstrate any signs of distress or appear to be suffering from a serious medical condition, although there was some minor bleeding from wounds on Plaintiff's arms and legs for which he was provided paper towels to absorb. (King: ¶ 14) (Video)

4

## MEMORANDUM OF LAW

The Plaintiff has sued Defendant David King under 42 U.S.C. Sec. 1983 for constitutional violations involving excessive force by law enforcement officers during the Plaintiff's arrest. As to King, Plaintiff's allegations appear to be that King stood by as other law enforcement officers employed by the Jacksonville Sheriff's Office utilized K-9 dogs to effectuate Plaintiff's arrest and during the course of the deployment of those dogs, excessive force was utilized. Although Plaintiff offers allegations of inadequacies in the health care provided after the arrest, Plaintiff does not allege in his complaint that King played any role in those decisions or was in a position to provide such care. The allegations found in the Plaintiff's amended complaint and in his deposition fail to establish any liability on King's part.

There is no question that in the instant case Plaintiff was arrested and there is no dispute that his arrest was lawful, based upon his plea and conviction. As a result, the use of force during Plaintiff's arrest is presumptively reasonable since the law allows the use of force in order to effectuate an arrest. The law only prohibits the use of excessive force during the course of an arrest under Fourth Amendment standards. The Supreme Court has repeatedly recognized that not every instance of the use of force, or even unreasonable force, in effectuating an arrest constitutes a violation of the Fourth Amendment. City of Oklahoma City v. Tuttle, 471 U.S. 808 (1985). The Supreme Court has also noted that not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. Saucier v. Katz, 533 U.S. 194 (2001). In Saucier, the Court stated that police conduct pertaining to the use of force must be judged under the Fourth Amendment standard of reasonableness. 533 U.S. 209.

Utilizing the Fourth Amendment standard, the court in Priester v. City of Riviera Beach, 208 F.3d 919, at 924 (11th Cir. 2000), citing Graham v. Connor, 490 U.S. 386 (1989), stated: "Whether the amount of force used was reasonable is determined objectively 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and requires 'careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. (emphasis supplied). Moreover, "[I]t is well settled that the right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it" and "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation" Draper v. Reynolds, 369 F.2d 1270, at 1278 (11th Cir. 2004).

In deciding whether a particular application of force was constitutionally permissible, this Court must balance and consider several factors. These factors are the guideposts both as to individual and governmental or official capacity liability. The Court should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officer or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. Graham v. Conner, 490 U.S. 386 (1989), at 396; Lee v. Ferraro, 284 F. 3d 1188, 1197 (11th Cir. 2002). This circuit also still uses the analytical framework established pre-Graham in Leslie v. Ingram, 786 F. 2d 1533 (11th Cir. 1986), which requires the balancing of the following factors: (1) the need for the

application of force, (2) the relationship between the need and amount of force used and (3) the

extent of the injury inflicted. *See also*, Draper v. Reynolds, *supra*.

In the instant case, when viewed in the light most favorable to King, the record evidence

shows that the use of force against the Plaintiff was constitutionally reasonable and that Defendant

King was not in a position to prevent or stop the use of force, even assuming it was excessive,

rendering the Plaintiff's claim for bystander liability unsustainable.

While the Plaintiff alleges that the use of force against him was both excessive and

unnecessary, the Affidavit of David King establishes that the use of force against the Plaintiff was

not excessive and was reasonable.  According to King (1) there was probable cause to arrest the

Plaintiff for committing the violent felony of aggravated sexual battery; (2) the Plaintiff knowingly

evaded arrest by law enforcement officers by hiding under the mobile home where he was located

and by refusing to crawl out from under the mobile home; (3) law enforcement officers reasonably

believed the Plaintiff was possibly armed and was a threat to officer safety; (4) there was a clear and

present danger to the public if the Plaintiff was not captured; (5) the Plaintiff was warned that if he

did not surrender, the police canine would be released and the Plaintiff would be bitten.  In addition,

Defendant King and C.W. Wilkie (Doc. 43-1) state that once the police canine engaged the Plaintiff,

the Plaintiff chose to fight the dog rather that surrender. *Id.*  The Plaintiff attempted to choke the dog,

shoved insulation into the dog's mouth, and continued to fight the dog for several minutes. *Id.*  Thus

the extent of the injury caused by the multiple dog bites was the result of the Plaintiff's own actions.

*Id.*

Once the Plaintiff complied with the law enforcement officers' commands, the dog was

7

disengaged and did not bite the Plaintiff again. *Id.* Further, King and Wilke indicate that the minimum amount of force necessary was used to secure the Plaintiff in handcuffs, and once the Plaintiff was handcuffed, no force was used against him. *Id.* In contrast to the Plaintiff's allegations, the version of the Plaintiff's arrest provided by King and Wilke shows that it was objectively reasonable to use a canine to apprehend the Plaintiff. Accepting King's and Wilke's version of the events as true and applying the tests set forth in Graham and its progeny, the force used against the Plaintiff was reasonable under the Fourth Amendment. *See,* Crenshaw v. Lister, 556 F.3d 1283, 1292 (11th Cir. 2009) (No constitutional violation when plaintiff was bitten by police canine 31 times because Plaintiff was suspected of having committed armed robbery, actively fled from police, and was attempting to hide in dense woods). Defendant King realizes that Plaintiff offers a different version of these events and that the fact disputes created by Plaintiff may render the granting of summary judgment as to the actual use of force a close call. Defendant King does not seek summary judgment on that basis since he did not actually engage in the use of force and he did not order same.

Plaintiff does not allege that King himself utilized force against him, ordered the use of force or that King struck, kicked or otherwise abused him. Nor does Plaintiff allege that King had control of the K-9 dog that Plaintiff alleges bit him unnecessarily so as to constitute excessive force. Instead, although not specifically articulated, Plaintiff's theory appears to be that Defendant King failed to intervene to prevent the use of force involving the K-9; i.e. a theory of "bystander liability." In this regard, Plaintiff's claim fails.

Without question, a non-participating officer may be held liable for the failure to intervene to prevent an unlawful use of force. Ensley v. Soper, 142 F.3d 1402 (11th Cir. 1998). However, before

8

liability can be imposed for failure to intervene, it must be shown that an officer alleged to have stood idly by must be in a position to intervene. Id. In the Ensley case, the court determined that this required that there must be evidence that the officer upon whom liability is to be imposed must have observed the alleged abuse or had an opportunity to intervene. In Ensley, because the officer was not in a position to know of the circumstances involving the alleged victim, the court declined to impose liability.

In the instant case, the similar circumstances exist where, from Plaintiff's own testimony, and contrary to the allegations set forth in his complaint, King did not deploy the K-9 and was not in a position to cease the deployment of the K-9 or the dog's efforts to apprehend after it was deployed. Plaintiff does not allege King issued any commands to the dog to attack or could issue any command to stop the actions of the K-9. Since, by Plaintiff's own admissions, the actions were taking place in the confined space under a mobile home, Plaintiff does not allege King was in a position to stop the use of the K-9. Since King was not the handler for the K-9 dog, it is unlikely there was anything he could do to prevent the use of the K-9 and to expect King to crawl under the mobile home and to place himself between the K-9 and the Plaintiff is unreasonable and not required in the law. The courts have previously held that the failure to intervene will be excused when the events happen quickly so as to preclude the opportunity to intervene, as opposed to a prolonged and continuing course of abuse. See, State of North Carolina ex. rel. Hailey v. Westmoreland, 267 F.Supp.2d 497 (M.D.N.C. 2003); Thompson v. Boggs, 33 F.3d 847 (7th Cir. 1994); Randall v. Prince George's County, Maryland, 302 F.3d 188 (4th Cir. 2002). Applying this rule of law to the facts of this case as admitted by the Plaintiff and as stated by King, it is likewise apparent that the events pertaining to

the Plaintiff did not present a situation that provided an opportunity for King to intervene.

Plaintiff appears to offer in some of his filings some form of vague reference to King in the context of medical care. However, Plaintiff's complaint offers no such allegations as to King. Regardless, the allegations of Plaintiff's complaint or other filings do not establish deliberate indifference on the part of Defendant King related to his medical care.

First, in the context of medical care, in order to state a claim under the Fourteenth Amendment based on the failure to provide medical treatment, the Plaintiff must prove that Defendant was deliberately indifferent to Plaintiff's known serious medical needs. Aldridge v. Montgomery, 753 F. 2d 970 (11th Cir. 1985); Hamm v. DeKalb County, 774 F. 2d 1567 (11th Cir. 1985). Deliberate indifference is not established unless "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). To sustain a claim, the Plaintiff must show that the challenged conduct was "very unreasonable in light of a known risk" of harm or suffering. Hardin v. Hayes, 52 F. 3d 934, 939 (11th Cir. 1995) *citing*, Farmer, 511 U.S. 825, 114 S.Ct. at 1978 - 79. Deliberate indifference must be more than a medical judgment call or an accidental or inadvertent failure to provide adequate medical care. Where an inmate has received medical attention, and the dispute is over the adequacy of that attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. Harris v. Thigpen, 942 F. 2d 1495, 1507 (11th Cir. 1991) (*quoting* Waldrop v. Evans, 871 F. 2d 1030, 1035 (11th Cir. 1989)). To do otherwise would be "to constitutionalize claims that sound in tort law." Hamm v. DeKalb Co., 774 F. 2d 1567,

10

1575 (11th Cir. 1985).

To prevail on a claim for inadequate medical treatment, a prisoner must also satisfy an objective and a subjective requirement. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir.2000). He must show an "objectively serious deprivation" of medical care by demonstrating (1) "an objectively serious medical need ... that, if left unattended, poses a substantial risk of serious harm," and (2) that the prison official's response "to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." Id. (quotations and citations omitted).  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir.2003).

A prisoner must also show a subjective intent to punish by demonstrating that the official acted with deliberate indifference. Taylor, 221 F.3d at 1258. To satisfy this requirement, a prisoner can show the official's: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir.2004).  Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all. Id.

In Townsend v. Jefferson County, 601 F.3d 1152 (11th Cir. 2010), the court declined to impose liability upon non-medical personnel, such as deputy sheriffs, on plaintiff's claims of deliberate indifference where the plaintiff had received medical examination and treatment.  In that

case, since the deputy sheriffs would be entitled to rely upon the expertise of the trained medical personnel that the condition did not involve an emergency and the plaintiff did not show that the situation was so dire that lay deputies would have known of the serious nature of the injury and the misjudgment on the part of medical personnel, there was no basis to impose liability upon the deputy sheriff defendants. *Id.*, at page 1158-1159. In <u>Andujar v. Rodriguez</u>, 486 F.3d 1199 (11th Cir. 2007), the court found the absence of deliberate indifference on the part of paramedics who released to law enforcement officers an arrestee who had suffered bite wounds after he had been apprehended by law enforcement. In that case the plaintiff had been provided treatment for his wounds and the need for any further medical treatment was not shown to be urgent.

In this case, although there is no question that Defendant King would have knowledge of the fact that Plaintiff had been bitten by the K-9 dog and could observe Plaintiff's bleeding wounds, Plaintiff has failed to demonstrate that King was aware of any emergency that existed with regard to the wounds or that "serious medical harm" had been incurred that required immediate medical treatment or that would follow from any brief delay in medical treatment. From a review of the video recording made of the interview of the Plaintiff conducted by King, it is apparent that Plaintiff's wounds are not creating a serious medical condition or a risk of serious medical harm.

Although Plaintiff is obviously suffering from minor bleeding, there is no indication from Plaintiff's behavior that the bleeding is so serious that it was causing immediate harm or constituted a "serious medical need" and he is provided the means to cover the wounds. Although Plaintiff can be said to be in some discomfort, a review of the video recording does not demonstrate that he is in great pain; his ability to participate in the interview does not appear to be impaired. Moreover, from

a review of the video, one can see that Plaintiff does not immediately request medical attention and to the extent there is a reference to needing medical attention, it does not contain any degree of urgency that establishes a serious medical need that Defendant King would have subjectively known about or disregarded. Not being a medical professional with medical training, King cannot be held to the same standard as a doctor, nurse, or similar health care provider. The fact that Plaintiff does not immediately ask for medical attention when the interview is commenced or refuse to engage in the interview until he is provided medical attention, demonstrates this lack of urgency and the inability of King to be aware of or appreciate any degree of urgency. Finally, Plaintiff did receive medical attention at the scene of his apprehension and after the interview was concluded, and there is no proof that has been provided that any delay resulting from any actions or omissions of Defendant King served to cause serious medical harm or otherwise exacerbate the injuries Plaintiff incurred as a result of the K-9 dog bites.

Furthermore, Defendant King has been sued individually thereby entitling him to the defense of qualified immunity. "Qualified immunity offers complete protection for governmental officials sued in their individual capacity if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F. 3d 1340, 1346 (11th Cir. 2002), citing, Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The law is well established in the Eleventh Circuit that a qualified immunity defense is to be decided by the court as a matter of law. Stone v. Peacock, 968 F. 2d 1162 (11th Cir. 1992); Ansley v. Heinrich, 925 F. 2d 1339 (11th Cir. 1991). Plaintiff has not alleged or proven any facts that would overcome King's entitlement to this defense.

13

The Supreme Court has made it clear that a court must first determine whether there has been a constitutional violation. If a violation could be made out on a favorable view of the non-moving party's submissions, the next step is to determine whether the right was clearly established. Saucier v. Katz, 533 U.S. 194 (2001). As argued above, Defendant King did not violate Plaintiff's constitutional rights. As a result, this Court need not address whether a right was violated that was clearly established at the time of which Plaintiff complains. Defendant King addresses the question of whether a constitutional right was clearly established only in an abundance of caution.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be *clear* to a reasonable officer that his conduct was unlawful in the situation he confronted." Vinyard, *citing*, Saucier, 533 at 202 (emphasis added). Saucier further instructs: "If the law did not put the officer *on notice* that his conduct would be *clearly* unlawful, summary judgment based on qualified immunity is appropriate." Saucier 533 at 202 (emphasis added). The United States Supreme Court reiterated in Hope v. Pelzer that "the salient question . . . is whether the state of the law . . . gave [the officers] fair warning that their treatment of [the plaintiff] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2516 (2002). Hope repeated that officers sued in a section 1983 civil rights action have a "*right to fair notice.*" Hope at 2515 (emphasis added).

Hope also reaffirmed:

> For a constitutional right to be clearly established, "its contours must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Id. at 2515 (citations omitted).

14

For a point of law to be clearly established, that point must be established in the jurisdiction in which the officer's conduct is being scrutinized. For the existence of a right to be clearly established in Florida, and to be the standard against which the actions of the Defendant are judged, the right must have been enunciated by the United States Supreme Court, the Eleventh United States Circuit Court of Appeal, or the Florida Supreme Court. Hamilton v. Cannon, 80 F. 3d 1525, 1532 n. 7 (11th Cir. 1996); Jenkins v. Talladega City Board of Education, 115 F. 3d 821 (11th cir. 1997). Put simply then, in order for the protection of qualified immunity to be stripped from Defendant, the Plaintiff must prove, as to a fact-specific, narrowly tailored issue, that a law enforcement officer, would know, beyond a reasonable doubt, when the instant actions were being taken, that the Constitution was being violated. Montoute v. Carr, 114 F. 3d 184 (11th Cir. 1997); Suissa v. Fulton County, 74 F. 3d 266, 269 (11th Cir. 1996). Qualified immunity can only be overcome in that "slender category of cases" where the proof shows conduct which lies "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent". Smith v. Mattox, 127 F. 3d 1416, 1419, 1420 (11th Cir. 1997). Plaintiff cannot meet his burden of showing that Defendant's conduct was contrary to clearly-established law.

It is undisputed that during the time period of which Plaintiff complains, Defendant King was acting within the scope of their discretionary authority as a deputy sheriff employed by the Nassau County Sheriff. No record evidence exists that Defendant took any actions that a reasonable officer would know violated clearly established law. As it related to the arrest of the Plaintiff, Defendant King merely acted to assist in the identification of Plaintiff and to attempt to persuade Plaintiff to surrender. He did not utilize any force during the course of the arrest of the Plaintiff, did not

exercise any control over the K-9 dog that bit the Plaintiff and was not in a position to intervene to prevent any excessive use of force, assuming the force utilized was excessive. Simply stated, at the time of this event, there was no decisional law from the U.S. Supreme Court, the 11th Circuit, or the Florida Supreme Court, in a factually-similar case, putting Defendant on notice that his actions would violate clearly-established law. To the contrary, the law as set forth above reveals that in this circuit, as in others, the courts have recognized the lawfulness of the actions of Defendant. *See,* Andujar v. Rodriguez, *supra.* This, of course, it the type of decisional law that qualified immunity is made of.

In the context of the use of force, the courts have further repeatedly urged that, in reviewing decisions made by law enforcement officers, "Our precedent instructs us to take into account that 'reconsideration [after the uncertainty and the excitement of the moment have passed] will nearly always reveal that something different could have been done if . . . the future [was known] before it occurred.' *Carr v. Tatangelo, 338 F.3d 1259, 1270 (11th Cir. 2003)."* Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005). *See also,* Crosby v. Terry, 394 F.3d 1328, 1333 - 1334 (11th Cir. 2004); Draper v. Reynolds, *supra*; Kenyon v. Edwards, 462 F.3d 802 (8th Cir. 2006).

Simply stated, no record evidence exists that Defendant King personally took any action toward Plaintiff that a reasonable officer would have known clearly violated established law under the circumstances. Accordingly, Defendant King is entitled to qualified immunity from Plaintiff's constitutional claims.

WHEREFORE, Defendant King urges that his Motion for Summary Judgment be granted, that this case be dismissed as to him and that he be awarded costs and attorney's fees as allowable

16

under law.

    Respectfully submitted this 10th day of November 2010.

                         */s/ KEITH C. TISCHLER*
                         KEITH C. TISCHLER
                         Fla. Bar No. 0334081
                         JOLLY & PETERSON, P.A.
                         Post Office Box 37400
                         Tallahassee, Florida 32315
                         Tel:    (850) 422-0282
                         Fax:    (850) 422-1913

                         *Attorney for Defendant KING*

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by Certified U.S. Mail to Steven Jones, #J21218, Wakulla Correctional Institution, 110 Melaleuca Drive, Crawfordville, FL 32327 and via electronic filing to Sean B. Granat, Assistant General Counsel, City of Jacksonville, 117 W. Duval Street, Ste. 480, Jacksonville, FL 32202 this 10th day of November 2010.

                         */s/ KEITH C. TISCHLER*
                         KEITH C. TISCHLER

17