UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

STEVEN LATHEL JONES,

         Plaintiff,

vs.

     CASE NO.:    3:09-cv-1150-J-32JRK

JOHN RUTHERFORD, et al.,

         Defendants.

_____/

**DEFENDANT SHERIFF JOHN RUTHERFORD'S DISPOSITIVE
MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW**

       Defendant Sheriff John Rutherford ("Rutherford"), in both his official capacity and

individual capacity, pursuant to Rule 56, Fed. R.Civ. P., hereby requests that the Court grant

summary judgment in his favor on all claims against him in Plaintiff's Amended Complaint.  In

support of this motion, Defendant states that there is no genuine issue of material fact or law

entitling the Plaintiff to recover on his claims through  42 U.S.C. §1983.

**MEMORANDUM OF LAW**

**I.**     **UNDISPUTED STATEMENT OF FACTS**

       This action arises out of an encounter between Plaintiff, Steven Lathel Jones, and law

enforcement officers of the Jacksonville Sheriff's Office (JSO) and the Nassau County Sheriff's

Office.  The uncontested facts in this case are taken from the declarations of: Officer G.A. Rose

("Rose"); Officer C. Fisette ("Fisette"); Chief T. Wildes ("Wildes"); Director F.H. Lewis

("Lewis"); Officer Charlie Bridgeman, Jr. ("Bridgeman"); the second declarations of Defendant

Charlie Wilkie ("Wilkie II") and Dr. Max Solano ("Solano II"); and the Plaintiff's responses to

Defendant Rutherford's interrogatories. [1]   The uncontested facts are also taken from the

following exhibits, previously filed with the Court:  affidavit of Defendant David King ("King")

---

[1] These exhibits are being filed contemporaneously with this motion. *See* Rutherford's and Wilkie's  Joint
Notice of Filing Exhibits in Support of Their Respective Motions for Summary Judgment.

[Doc. 84-1]; declaration of John Kvistad  ("Kvistad")[Doc. 84-4]; the  deposition of the Plaintiff [Doc. 84- 2] ("Jones").

The Plaintiff was arrested on October 23, 2007 on a Nassau County warrant for sexual battery, aggravated battery, and burglary with a battery. (King; Rose Exh. "A"). The encounter at issue began when Nassau County deputies were notified that Mr. Jones was living at 4523 Hunt Street, in Jacksonville, Duval County, Florida. (King ¶ 4).  When Nassau County deputies determined that Mr. Jones was present at that address, they called the Jacksonville Sheriff's Office for assistance in serving the warrant. *Id*.¶ 6.  Mr. Jones was located in the crawl space underneath the residence and was believed to be attempting to hide from police. *Id*. ¶ 8.  Co-Defendant K9 Officer Charlie Wilkie was called to the scene to assist in apprehending the Plaintiff.  (Wilkie II Exh. "A").  Prior to deploying his police service dog, Officer Wilkie believed that (1) there was probable cause to arrest the Plaintiff for sexual battery; (2) the Plaintiff knew the police were present, actively fled, was hiding under a mobile home, was possibly armed and was a threat to officer safety; (3) there was a clear and present danger to the public if the Plaintiff was not arrested. *Id*.  At that point, Wilkie released the police service dog under the mobile home. *Id.*  The police dog apprehended the Plaintiff, biting him multiple times in the process. *Id.*  The Plaintiff eventually came out from under the mobile home and, after a brief struggle,  was taken into custody at 4:14 P.M.  (Rose Exh. "A").  The Jacksonville Fire and Rescue Department (JFRD) was called at 4:15 P.M., arrived within five minutes, and rendered aid to the Plaintiff.  (Kvistad ¶ 5-6; Jones p. 102).  JFRD cleaned the Plaintiff's dog bite wounds, wrapped the wounds that required bandages, and checked the Plaintiff's vital signs. (Kvistad ¶ 8-10).  After evaluating and treating the Plaintiff, JFRD determined that the Plaintiff did not require further medical treatment and cleared the Plaintiff to be taken to jail. *Id.* ¶ 11-12.   The Plaintiff was then transported to JSO's Police Memorial Building at 4:50 P.M., where he was interviewed by Nassau County detectives.  (Rose ¶ 14, 16).  At 8:20 P.M., the Plaintiff was

brought to the Duval County Pre-trial Detention Facility (PTDF) for booking and was evaluated by a jail nurse, who requested that the Plaintiff be taken to Shands Medical Center for further evaluation.  (Fisette ¶ 6).  The Plaintiff was taken to Shands at 8:35 P.M.  *Id.* ¶ 7.  The Shands medical records reflect that the Plaintiff did not require stitches and that his wounds were merely cleaned and the Plaintiff was discharged.  (Solano II ¶ 7).

The Plaintiff returned to the PTDF from Shands in the early morning of October 24, 2007.  (Fisette ¶ 8).  Later that day, the Plaintiff was again evaluated by PTDF medical staff and was again sent, at the direction of PTDF medical staff, to Shands for further evaluation.  *Id.* ¶ 9; (Solano II ¶ 12).

Plaintiff was incarcerated in the PTDF from October 23, 2007 to October 29, 2007. (Fisette ¶ 5,11).  PTDF medical records show that the Plaintiff's bandages were changed daily, and that he was given his prescription pain medication and antibiotics daily.  (Solano II ¶ 13). During his stay at the PTDF, the Plaintiff was taken to a PTDF medical clinic ten times.  (Fisett ¶ 10) and (Solano II ¶ 10).  Further, Plaintiff never filed a request for medical service form, although he had done so multiple times during a prior period of incarceration. (Solano II ¶ 15). Additionally, although he was issued an inmate handbook explaining grievance procedures upon admittance to the PTDF, the Plaintiff never filed a grievance and failed to exhaust his administrative remedies regarding the medical care he received while in the PTDF.  (Wildes ¶ 4-6).

It is further uncontested that there is no evidence of a custom, policy, or practice of the Jacksonville Sheriff's Office of tolerating excessive force or being deliberately indifferent to serious medical needs.  Nor is there any evidence of any Jacksonville Sheriff's Office policy that was the moving force behind any of the alleged Constitutional violations. During the Plaintiff's deposition, he testified as follows:

Q:      Do you have any evidence that any custom, practice or policy of the Jacksonville

Sheriff's Office caused any of your injuries?

A:      One more. Do I have any evidence? Yes, sir. I have photos. I have doctor reports. I have documents, jailhouse rule manuals that - things they didn't follow. Yes, I do.

Q:      Are you claiming that any policy or procedure of the Jacksonville Sheriff's Office caused or contributed to your injuries?

A:      I don't understand what you [sic] sayin'. Policy, I haven't read policies. So I can't answer that. I haven't seen that.

(Jones p. 105). *See also* Plaintiff Responses to Rutherford's Interrogatories, # 22.

The uncontested evidence shows that JSO trains its officers <u>not</u> to use excessive force. (Lewis ¶ 4). The JSO has in place an internal affairs unit and an integrity unit which aggressively seek to detect and deter any such activity. *Id.* ¶ 3. Operational orders in effect at the time of Mr. Jones arrest specifically provided that only necessary force be used, and JSO policy did not condone or tolerate unnecessary or excessive force. *Id.* Indeed, the record evidence establishes that the JSO policy is not to tolerate excessive force. As set forth in Director Lewis's declaration, when officers violate the JSO rules regarding use of force, they are subject to discipline. *Id.* ¶ 6.

Further, JSO's policies and procedures are fully in accordance with state and national standards and the JSO is a fully accredited agency by CALEA – the Commission on Accreditation for Law Enforcement Agencies and the Commission for Florida Law Enforcement Accreditation. *Id.* ¶ 2. Finally, there is no testimony or evidence at all in this record that there was any JSO custom or policy, written or unwritten, of condoning or tolerating excessive force prior to or at the time of the incident.

## II.      THE PLAINTIFF'S CLAIMS

The Plaintiff's Amended Complaint [2] attempts to allege claims, through 42 U.S.C. §1983,

_____

[2] Rutherford filed a motion to dismiss the Plaintiff's Amended Complaint [Doc. 34] that is still pending before this Court.

for a number of constitutional violations.  Although the Amended Complaint does not contain individually numbered counts, the Plaintiff makes claims under three general theories; (1) Excessive force during his arrest; (2) deliberate indifference to serious medical needs shortly after the force was used; and (3) inadequate medical care while incarcerated in the PTDF.  It is unclear whether the Plaintiff intended to sue Defendant Rutherford for all of the alleged violations.  It is also unclear whether the Plaintiff intended to sue Rutherford in his official or individual capacity regarding these claims.  Therefore, in an abundance of caution, Rutherford moves for summary judgment on all claims brought by the Plaintiff, in both his official and individual capacities.  As will be discussed below, summary judgment should be granted in Rutherford's favor on all claims made against him.

## III.   THE SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when the record demonstrates that "there is no genuine issue as to any material fact … and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ. P. 56(c).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted).  A fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).  Thus, the party moving for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.  Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. ___, 127 S.Ct. 1769, 1776 (2007); *see also, Kesinger v. Herrington*, 381 F.3d 1234 (11th Cir. 2004); *Cuesta v. School Bd. of Miami-Dade County*, 285 F.3d 962, 970 (11th Cir. 2002) ("A court need not permit a case to go to a jury … when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'") (citations omitted). Thus, the purpose of summary judgment is to determine "whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also, Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). Thus, "[w]hen a moving party has discharged its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts … Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S.Ct. 1348, 1356 (1986) (internal citations omitted). Further, "[i]f the non-movant's response to the summary judgment motion consists of nothing more than mere conclusory allegations, the Court must enter summary judgment in the moving party's favor." *Ruszala v. Walt Disney World Company*, 95 F.Supp.2d 1323, 1325 (M.D. Fla. 2000) (citations omitted).

## IV.   CLAIMS AGAINST RUTHERFORD IN HIS OFFICIAL CAPACITY

Summary judgment should be granted for all claims against Rutherford in his official

capacity. A suit against a governmental official in his official capacity is deemed a suit against the entity that he represents. *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir.1999); *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir.1991)(Suits against municipal officers are suits directly against the city that the officer represents"). Thus, if the Court interprets the Amended Complaint as suing Rutherford in his official capacity, then the Plaintiff's claims are really made against the City of Jacksonville.[3] The facts are undisputed that the City of Jacksonville is entitled to summary judgement in this case.

### A.    Municipal Liability under Section 1983-Generally

To prevail against a municipality in a civil rights action under 42 U.S.C. § 1983, a plaintiff must show that he or she was deprived of a constitutional right secured by the Constitution and laws of the United States.[4] The facts in the instant case, as outlined above, establish that no constitutional violations occurred.

Furthermore, to hold a municipality liable, not only must a plaintiff show the violation of an identifiable constitutional right by unconstitutional state action, but she or he must also prove that an official "custom" or "policy" was the "moving force" behind the alleged constitutional deprivation. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also, Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Municipal liability should not be imposed when the municipality was not itself at fault. *Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

---

[3] Accordingly, Sheriff Rutherford is referred to herein interchangeably as the "City" (City of Jacksonville/Duval County) or "JSO" (Jacksonville Sheriff's Office) or the "Sheriff" as the context requires.

[4] *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510; *Dollar v. Haralson County,* 704 F.2d 1540, 1542-43 (11th Cir.), *cert. denied,* 464 U.S. 963, 104 S.Ct. 399 (1983). Section 1983 alone creates no substantive rights; rather it provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws. *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 2674 n. 3 (1979); *Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d 1030, 1032 (11th Cir.1987). An underlying constitutional right must exist before a § 1983 action will lie. *Wideman,* 826 F.2d at 1032.

"It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under §1983." *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203 (1989) (citations omitted); *McMillan v. Monroe County, Ala.*, 520 U.S. 781, 785, 117 S.Ct. 1734, 1736 (1997) (a local government is liable under Section 1983 for its policies that cause constitutional torts). Thus, a municipality is not liable under Section 1983 solely for the acts of its employees. *Monell*, 436 U.S. at 690-695; *Daniels*, 474 U.S. at 328, 106 S.Ct. at 663 (" ... the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property.") (emphasis original); *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) (local government liability under Section 1983 cannot be based solely on the theory of respondeat superior); *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991) (civil rights liability may be imposed on a governmental entity only when the constitutional violation is due to the existence of an improper policy or the absence of a policy).

In addition, absent an express custom or policy that authorizes or directs the alleged constitutional deprivation, the Supreme Court has explained that a municipality's failure to train its employees may amount to a custom or policy in only "limited circumstances." *City of Canton*, 489 U.S. at 389. These "limited circumstances" occur only where the municipality has displayed a "deliberate indifference" to the rights of its inhabitants. *Id*. "To establish ... 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. "[I]nadequacy of police training may serve as a basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition ... that a municipality can be liable under §1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *Id*. (citations omitted). Accordingly, to

-8-

establish deliberate indifference, a plaintiff must first demonstrate culpability on the part of the municipality or proof of "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law,'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970); *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice … actual or constructive knowledge of such customs must be attributed to the governing body of the municipality … [n]ormally random acts or isolated incidents are insufficient to establish a custom or policy."), and a causal link between the municipal action and the constitutional injury. *See Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 1388 (1997); *Scott v. City of Lanett*, 845 F.Supp. 815 (M.D. Ala. 1993).

Moreover, to establish a claim of the failure to train or supervise, "a plaintiff is held to a high standard in showing the connection between the training or supervision and the injury suffered.   A plaintiff is required to 'demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.'" *Salter v. McNesby*, 2007 WL 2459246 *17 (N.D. Fla.) (citations omitted).   This high standard is necessary because "a lesser standard of fault would result in de facto *respondeat superior* liability on municipalities - a result [the Supreme Court] rejected in *Monell*.   Indeed, the mere fact that a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee permits no inference of municipal culpability and causation." (Id.) (citations omitted).

Thus, for example, in *Gold*, the Eleventh Circuit held that a plaintiff's false arrest claim against the City of Miami could not stand where he had presented no evidence of prior incidents. In addition, the need to train was not "so obvious" as to put the city on notice in the absence of any prior incidents. *Id*. at 1351-52; *see also*, *McDowell v. Brown*, 392 F.3d 1283 (11th Cir.

2004) (noting that isolated incidents generally do not create liability); *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir. 1990) (finding no liability for a deputy sheriff's actions where "no evidence of a history of widespread prior abuse ... put the sheriff on notice of the need for improved training or supervision"); *Owaki v. City of Miami*, 491 F.Supp.2d 1140 (S.D. Fla. 2007) (failure to stop mere isolated incidents resulting in violation of constitutional rights cannot be deemed tacit approval of unofficial custom by policy-making officials to establish liability under Section 1983).

As will be discussed more fully below, the Sheriff is entitled to summary judgment on the claims against him both because there was no constitutional violation in the first instance, and because the facts in the record fall far short of establishing *Monell* liability in any event.

## B.    Excessive Force Claim

While Rutherford adamantly denies the claims of excessive force made by the Plaintiff and will present credible testimony to contradict those claims, Rutherford acknowledges that the Plaintiff's allegations, together with his own testimony, create a dispute in material fact as to whether excessive force was used against him during his arrest. [5]   However, even assuming *arguendo* that excessive force was used against the Plaintiff during his arrest, his claims still fail to establish Constitutional liability against Rutherford and summary judgment should be granted in Rutherford's favor.

### 1.    There is No "*Monell*" Evidence Regarding Excessive Force

Even assuming a constitutional deprivation (excessive use of force) in this instance, the

---

[5] Although disputed by the Defendants, the Plaintiff claims that he was not given a warning prior to the deployment of the police dog. Even if there is a factual dispute over this issue, it is inconsequential to, and does not defeat Rutherford's motion for summary judgment. This is because failing to warn prior to the deployment of a police K9 does not violate the Constitution. *See Trammell v. Thomason*, 335 Fed. Appx. 835, 842 (11th Cir. 2009)(No case from the 11th Circuit, Supreme Court, or Supreme Court of Florida holds that releasing a police K9 without an adequate warning violates the Constitution). Further, even if failing to warn did violate the Constitution, the JSO K9 written policy requires that a dog handler "must give a verbal warning to the suspect that a police service dog will be released and will bite the suspect, unless such a verbal warning is not practical under the circumstances or will endanger the safety of the handler or others." (Bridgeman ¶ 17).

undisputed facts in the record establish that there was no improper policy or custom maintained or condoned by the City that was the direct cause of any constitutional injury sustained by the Plaintiff in this incident.

The City's written directives regarding Use of Force (Lewis Exh. "A") and the activities of the K9 Unit (Bridgeman Exh. "A") in effect at the time of the incident were in accord with *Graham v. Connor* and do not mandate or allow the use of excessive force by JSO officers, including officers assigned to the K9 Unit.  Specifically, the written K9 policy authorizes the use of K9 force under the direction of the K9 handler to "arrest or prevent the escape from custody of any person the officer reasonably believes to have committed an offense," after consideration of the following factors or criteria:

> (1) The severity of the crime at issue;
>
> (2) Whether the suspect poses an immediate threat to the  safety of the handler, his fellow officers, or others;
>
> (3) Whether the suspect is actively resisting arrest or  attempting to evade arrest by flight.[6]

Moreover, JSO's written K9 policy is in accord with the model canine policy promulgated by the IACP (International Association of Chiefs of Police), the Utah Police Officer Standards and Training Academy, and the Florida Department of Law Enforcement Standards on K9 Team Training and Certification.  (Bridgeman ¶ 12).

JSO's K9 Unit has an extensive and continual training program for both the handlers and dogs. *Id*. ¶ 5-9.  K9 teams are required to undergo an initial 408 hour training class and pass a state certification test to become state certified.  *Id.*  They are required to maintain that certification and pass a re-certification test annually.  *Id.*  Once certified, K9 teams train on a

---

[6] Bridgeman Exh. "A" at page 4. These factors are the "*Graham Critera*", used by courts in determining whether a particular application of force was constitutionally permissible.  See *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

daily basis. *Id.* Daily training records are kept and reviewed by K9 Unit trainers for compliance with training and JSO's policies, and remedial action is taken for non-compliance. Thus, neither JSO's K9 operations policy nor its K9 training program are unconstitutional as a matter of law or inadequate or lacking as measured against state and national police service dog training or operations standards.

Further, the Plaintiff has not identified any evidence to establish or support the existence of any unconstitutional policy, custom or practice of the City, either written or in the form of failure to train, supervise or discipline, that was the "moving force" of the alleged violation of his constitutional rights. Specifically, the record contains no evidence that Officer Wilkie or his police dog were inadequately or improperly trained. The record does, however, contain evidence of extensive training of JSO's K9 handlers and their dogs, including both Officer Wilkie and his police service dog, and there is no evidence in the record that this training was inadequate to the tasks that Officer Wilkie or any JSO K9 officer was expected to perform or that inadequate training caused Plaintiff's injuries. Moreover, the Plaintiff has not presented any evidence of a widespread custom of JSO using its police service dogs in an unconstitutional manner that was known to and ratified by Sheriff Rutherford, the final policymaker for the Sheriff's Office and the City. Nor has the Plaintiff shown the existence of an illicit custom that was so widespread as to constitute the force of law *and* caused Officer Wilkie to inflict excessive force on the Plaintiff.

As the Declaration of Director Lewis establishes, it is uncontradicted that the JSO is a fully accredited agency by CALEA. (Lewis ¶ 2). This important fact has been recognized previously in the Middle District, Jacksonville Division. *See Arline v. City of Jacksonville*, 359 F.Supp. 2d 1300, 1307 (M.D. Fla. 2005). Further, Director Lewis's Declaration establishes that the JSO trains its officers not to use excessive force, and that there is no basis to assert that there is an unwritten policy, custom or practice of tolerating such behavior. (Lewis ¶ 4).

-12-

The Plaintiff will likely argue that prior complaints made against Officer Wilkie serve as sufficient *Monell* evidence to defeat summary judgment.  Although Officer Wilkie's record shows that two complaints of excessive force were made against him, one in 1997 and one in 2004, the facts and circumstances of those complaints were reviewed by JSO's Internal Affairs Unit and it was determined that excessive force had not been used in those instances.  (Lewis ¶8). The Plaintiff has failed to present any evidence indicating that the complaints made against Wilkie had any merit, and for that reason, the complaints are insufficient to have put Rutherford (the City) on notice of any past or future misconduct by Wilkie.

In *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987), a plaintiff, claiming excessive use of force, submitted evidence that there had been ten citizen complaints about the defendant city's police officer.  However, the Eleventh Circuit held that the city did not have any notice of past police misconduct because the plaintiff never demonstrated that past complaints of police conduct had any merit.  *Id.  See also Gold*, 151 F.3d at 1351.  The *Brooks* Court stated that the plaintiff was "obligated to produce some evidence that the complaints against [the police officer] had some merit."  813 F.2d at 1193.  Further, the Court stated that "the number of complaints bears no relation to their validity."  *Id.*  In the instant case, there is no evidence that the prior complaints against Officer Wilkie had any merit; thus, this argument is insufficient to establish Municipal liability.  *See Id.*

In addition to training officers not to use excessive force, and disciplining officers who are found to have done so, the JSO takes a proactive approach to <u>prevent</u> excessive force by its officers. (Lewis ¶ 7). Through the "Personnel Early Warning System," the behavior of all JSO officers is monitored.  *Id.*  If an officer's behavior indicates potential problems, such as the likelihood to use excessive force, the officer is flagged and his supervisors are notified.  *Id.*  The supervisors then review the officer's situation and take appropriate action, which could include training or discipline.  *Id.*  The use of this Early Warning System demonstrates that, in addition

-13-

to its training and policies prohibiting the use of excessive force, JSO has an actual custom and practice of <u>not</u> condoning excessive force.

Because there is no proof that an official "custom" or "policy" was the "moving force" behind the Plaintiff's alleged constitutional deprivation, summary judgment should be granted. *See Monell*, 436 U.S. at 690-94.

### C.     Deliberate Indifference to Serious Medical Needs

The Plaintiff also appears to sue Rutherford for alleged deliberate indifference to the Plaintiff's serious medical needs.  The Plaintiff claims that this violation was committed by JSO officers shortly after the Plaintiff was arrested, thus while he was a pre-trial detainee.[7]  The undisputed facts show that the Plaintiff received medical treatment from paramedics within six minutes of his arrest, and was brought to the Shands emergency room within four-and-a-half hours of his arrest.  Additionally, JSO policy requires officers to obtain medical care, as soon a possible, for anyone injured by JSO's use of force.  This undisputed evidence shows that, as a matter of law, Rutherford is entitled to summary judgment on this claim.

### 1.     There Was No Constitutional Violation

In order to prove a claim of deliberate indifference to serious medical needs, a Plaintiff must satisfy both an objective and a subjective inquiry. *Bozeman v. Orum,* 422 F.3d 1265, 1272 (11th Cir. 2005) citing *Brown v. Johnson,* 387 F.3d 1344, 1351 (11th Cir.2004) and *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir.2003).  First, the plaintiff must prove that he had an objectively serious medical need. The Eleventh Circuit recently defined a serious medical need as:

---

[7]Claims of deliberate indifference to the serious medical needs of pretrial detainees are governed by the Fourteenth Amendement's Due Process Clause.  *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 n.6 (11th Cir.1997).  However, because the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner, the instant claim is properly analyzed under the decisional law of both the Eighth and Fourteenth Amendments.  *Andujar v. Rodriguez,* 486 F.3d 1199, 1203 (11th Cir. 2007).

> one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *In the alternative*, a serious medical need is determined by whether a delay in treating the need worsens the condition. *In either case*, the medical need must be one that, if left unattended, poses a substantial risk of serious harm.

*Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009)(*emphasis added, citations and internal quotations omitted*).  Here, because there is no question that the Plaintiff received medical care from (1) the JFRD, within minutes of his arrest, and (2) Shands Jacksonville within hours of his arrest, the Plaintiff cannot claim that he was denied medical care, but only that his receipt of medical care was delayed.  Thus, the appropriate test for whether a serious medical need existed in this case is whether "the delay in treatment worsened the medical condition." Id.[8]  It is the law of the Eleventh Circuit, that "[a]n inmate who complains that *delay in medical treatment* rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1188 (11th Cir. 1994)(*emphasis added*).  This principle was discussed in the recent case of *Moore v. Guzman*, 362 Fed.Appx. 50 (11th Cir. 2010).  In *Moore*, the plaintiff sued prison employees who allegedly delayed the plaintiff's necessary spinal surgery for 18 months. *Id.* at 51-52.  In affirming summary judgment for the defendants, the Eleventh Circuit noted that the plaintiff had an obligation to place verifying medical evidence in the record to establish the detrimental effect of a delay in medical treatment. *Id.* at 54 fn 5.  The Court determined that the plaintiff failed to satisfy that obligation because he "failed to provide medical records, expert testimony, or other evidence, other than his own testimony, that any delay in treatment caused him to suffer any injury." *Id.*

---

[8]  The record evidence fails to satisfy the other two tests as well.  There is no evidence of a physician diagnosing an injury as mandating treatment, and nothing suggests a lay person would easily recognize the necessity for a doctor's attention.

Similarly, in *Williams v. South Fulton Regional Jail,* a pretrial-detainee plaintiff made a claim of deliberate indifference to serious medical needs by alleging, among other things, that the defendant delayed changing his post-surgical bandages which caused his surgical wound to become infected. 152 Fed.Appx. 862, 864 (11th Cir. 2005). The Court affirmed summary judgment for the defendant stating that there was "no evidence establishing that the infection was caused by the alleged failure to change his bandages, rather than as a natural effect of his surgery." *Id*. In the instant case, the Plaintiff's failure to place "verifying medical evidence" in the record to establish the detrimental effect of delay in medical treatment is fatal to his case, as without it, he has not shown evidence of a constitutional violation. *Hill*, 40 F.3d at 1188; *Mann*, 588 F.3d at 1307.

In addressing the issue of delay of medical attention, courts have held that the tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. *Harris v. Coweta County,* 21 F.3d 388, 394 (11th Cir.1994); *Andujar,* 486 F.3d at 1204. In *Andujar*, the Eleventh Circuit reversed the denial of summary judgment to two paramedics who delay of the plaintiff's receipt of stitches to a wound, caused by a police dog bite. *Id.* The Court held that the delay of two hours was tolerable to give the police an opportunity to book the Plaintiff, even though the Plaintiff had trouble walking and was crying in pain. *Id.* In the instant case, the Plaintiff's wounds were not as serious as the wounds in *Andujar.* The Plaintiff did not require stitches- his wounds were merely cleaned and bandaged. Similar to *Andujar,* the reason for the delay in the Plaintiff's transportation to Shands was for investigation and booking of the Plaintiff. Thus, given the length and the reason for any delay in medical care, such delay was not unconstitutional. *Id.*

In addition to proving an objectively serious medical need, to prove a Constitutional violation, the plaintiff must also prove that a government official acted with deliberate indifference to the objectively serious medical need. *Id.* To satisfy this subjective element, a

-16-

Plaintiff must prove three things: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman,* 422 F.3d at 1272.  There is no evidence that any JSO officer had subjective knowledge of a serious risk of harm to the Plaintiff, however even if there was such evidence, it is uncontested that the risk was not disregarded because JFRD was called and the Plaintiff was evaluated and treated by paramedics within 6 minutes of being taken into custody (Rose ¶ 12, 14; Kvistad ¶ 6) and was taken to Shands within four-and-a-half hours of his arrest.  (Solano II ¶ 17).  Additionally, JFRD determined that the Plaintiff did not require additional medical care and cleared the Plaintiff to be taken to jail.  (Kvistad ¶ 11-12).  The law enforcement officers at the scene were entitled to rely on the determination made by JFRD's trained paramedics–that the Plaintiff did not require emergency medical treatment.  *See Townsend v. Jefferson County*, 601 F.3d 1152, 1158-59 (11th Cir. 2010).

Lastly, in addition to proving 1) an objectively serious medical need and 2) subjective knowledge of that medical need and disregard of it by more than gross negligence, the Plaintiff must also show that the indifferent actions or inactions of the Defendant <u>caused</u> injury to the Plaintiff.  *Goebert v. Lee County,* 510   F.3d at 1326.  Quite to the contrary, the uncontested evidence in the record establishes that there was no detrimental effect of any delay of medical care.  (Dec. Solano II).  *See Hill,* 40 F.3d at 1188 *citing with approval Gaudreault v. Municipality of Salem, Mass*., 923 F.2d 203, 208 (1st Cir.1990)(although hospital records showed that arrestee displayed multiple bruises to the forehead, left and right orbits of his eyes, nasal area, left ribs, right flank and left shoulder, and was suffering from abrasions to the cornea and upper back, consistent with alleged assault by police officer, there was "nothing in the record to suggest" that a ten-hour delay in medical treatment exacerbated these injuries "in the slightest").  Therefore, because there is no evidence to support the constitutional violation alleged, summary judgment should be granted.

2.      **There is No "*Monell*" Evidence Regarding Deliberate Indifference**

Even assuming *arguendo,* that Plaintiff could prove conduct that amounted to deliberate indifference to serious medical needs, summary judgment should still be granted.  As explained in section IV(A) above, summary judgment should be granted when there is no proof that an official "custom" or "policy" was the "moving force" behind the Plaintiff's alleged constitutional deprivation. *See Monell*, 436 U.S. at 690-94.  Here, the record is lacking such proof.  To the contrary, it is JSO's policy to obtain a medical evaluation as soon as possible or practical for individuals who show signs of any injuries, or who complain of injury as a result of any use of force by JSO.  (Lewis Exh. "A" p.3).  Additionally, the JSO K9 policy requires K9 Officers to provide appropriate first aid or medical attention whenever a JSO police service dog causes injury to any person.  (Dec. Bridgeman at ¶16).  Because there is no evidence in the record which demonstrates a custom, policy, or widespread practice of being deliberately indifferent to the medical needs of arrestees, nor is there evidence of a deliberate indifference to a need for such training, there can be no municipal liability and summary judgment should be granted.

D.      **Inadequate Medical Care in PTDF**

Beginning in paragraph 55 of the Amended Complaint, the Plaintiff makes a claim that two unnamed members of the PTDF medical staff provided inadequate medical care to the Plaintiff while he was incarcerated there.  Although the Amended Complaint does not allege, and the record contains no evidence that Rutherford had any involvement with this alleged Constitutional Violation, in an abundance of caution, Rutherford moves for summary judgment on this claim for the reasons stated below.

1.      **Failure to Comply with PLRA**

If the Court determines that this claim applies to Rutherford, summary judgment should be granted because the Plaintiff failed to comply with the Prison Litigation Reform Act, 42 U.S.C. § 1997 ("PLRA").  The PLRA requires exhaustion of available administrative remedies

before a prisoner can seek relief in federal court under 42 U.S.C. §1983.  Specifically, the PLRA directs that "[n]o action shall be brought with respect to prison conditions under §1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002).  Exhaustion of all available administrative remedies is a precondition to litigation and a federal court cannot waive the exhaustion requirement.  *Alexander v. Hawk*, 159 F.3d 1321, 1325 (11th Cir.1998). Additionally*, "*the PLRA exhaustion requirement requires proper exhaustion*." Woodford v. Ngo, 548 U.S. 81, 85 (2006).*  The Supreme Court in *Woodford* determined "[proper exhaustion] means ... that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." 548 U.S. at 88.  The Court further explained:

> [p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules [prior to seeking relief from a federal court] because no adjudicative system can function effectively without imposing some orderly structure on the courts of its proceedings ... Construing § 1997e(a) to require proper exhaustion ... fits with the general scheme of the PLRA, whereas [a contrary] interpretation [allowing an inmate to bring suit in federal court once administrative remedies are no longer available] would turn that provision into a largely useless appendage.

*Id.* at 90-93. This interpretation of the PLRA's exhaustion requirement "carries a sanction" for noncompliance and avoids making the PLRA exhaustion scheme wholly ineffective.  *Id.* at 95. Consequently, a prisoner cannot proceed to federal court after bypassing available administrative remedies, either by failing to properly exhaust administrative remedies or waiting until such remedies are no longer available, as allowing federal review under these circumstances would

impose no significant sanction on the prisoner and "the PLRA did not create such a toothless scheme." *Id.* Further, the PLRA's exhaustion requirement contains no futility exception where there is an available inmate grievance procedure. *See Booth*, 532 U.S. at 741 n. 6 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").

Because the instant claim is regarding jail conditions at the PTDF, and is brought by a Plaintiff currently confined in prison, the requirements of the PLRA apply to this claim. *See* 42 U.S.C. § 1997e(a). When the Plaintiff entered the PTDF, he was informed, as are all inmates, that complaints and grievances regarding medical issues must be made on a medical grievance form, and turned in to a nurse or other medical staff member within five days of the incident being grieved. (Wildes ¶ 4-5). The Plaintiff failed to comply with the PTDF's grievance procedures–he failed to file any grievance. *Id.* ¶ 6. *See also* Amended Complaint at p. 4. Because the Plaintiff has failed to exhaust his administrative remedies, as required by the PLRA, summary judgment should be granted as to the PTDF medical claim.

### 2.  No Constitutional Violation

It is well-settled that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). However, in *Gamble,* the Supreme Court stated that not:

> every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. . . . [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment.

*Id.* at 106, 97 S.Ct. 285.

Like the Plaintiff's claim discussed section IV(C) above, to show that a jail official acted with deliberate indifference to a serious medical need, a Plaintiff must set forth evidence of an objectively serious medical need, and must prove that the jail official acted with an attitude of deliberate indifference to that serious medical need. *Farrow*, 320 F.3d at 1243. Because the undisputed material facts fail to establish either of these factors, summary judgment should be granted.

The Plaintiff's claim of insufficient medical care in the PTDF is similar to the claim made in *Williams,* 152 Fed.Appx. at 863-864. There, plaintiff Williams claimed, among other things, that the South Fulton Regional Jail (SFRJ) staff failed to change his bandages, causing a surgical wound to become infected. *Id*. In affirming summary judgment for the defendants, the Court noted that the record showed that Williams was provided with a significant amount of medical care while at SFRJ and any delay or inattention by the defendants was not so excessive as to rise above simple negligence. *Id, citing Harris,* 941 F.2d at 1505. Further the court stated that there was no evidence establishing that the Plaintiff's infection was caused by the alleged failure to change his bandages, rather than as a natural effect of his surgery. *Id, citing Hill*, 40 F.3d at 1188. The Court also stated that Williams offered no verifying medical evidence, but instead just summarily contested the way that the medical records submitted by the defendants portrayed the course of events. *Williams,* 152 Fed.Appx. at 864.

In the instant case, the Plaintiff offers no verifying medical evidence to prove that the action or inaction of any PTDF medical staff caused injury. However, the instant record does contain evidence that the Plaintiff was provided with a significant amount of medical care while in the PTDF. (Solano II ¶ 11-16). During his PTDF incarceration, the Plaintiff was taken, twice, to Shands for emergency room treatment at the direction of PTDF medical staff. *Id.* Further, the PTDF records show that the Plaintiff was evaluated and/or treated at a PTDF medical clinic ten times during his October 2007 incarceration. *Id.* ¶ 16. The record also establishes that the

Plaintiff was given medication daily, and that his bandages were changed. *Id.* ¶ 13; Jones p. 114-115. [9]   Importantly, the Plaintiff never requested medical treatment by filing an Inmate Medical Request form during his October incarceration, although he frequently did so during previous periods of incarceration.  (Solano II ¶ 15).

Although the Plaintiff makes unsupported claims that his medical care was insufficient, it is undisputed that the condition of the Plaintiff's wounds during his incarceration at the PTDF were "to be expected and were part of the early stages of the body's healing process."  (Solano II ¶ 17).  There is no verified medical evidence that the Plaintiff was ever denied any necessary medical treatment.   Like in *Williams*, the record evidence in this case shows that any delay or inattention by the defendants to the Plaintiff's medical needs in the PTDF was not so excessive as to rise above simple negligence, which is insufficient to establish a Constitutional Violation. 152 Fed.Appx. at 864;  *Harris*, 941 F.2d at 1505 (Stating that medical treatment violates the Constitution only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience).

### 3.   No "*Monell*" Evidence Regarding PTDF Medical Claim

Even assuming *arguendo,* that the Plaintiff could prove deliberate indifference to serious medical needs, summary judgment should still be granted.  As explained in sections IV(A) and IV(C)(2) above, summary judgment should be granted when there is no proof that an official "custom" or "policy" was the "moving force" behind the Plaintiff's alleged constitutional deprivation. See *Monell*, 436 U.S. at 690-94.  There is no record evidence of any such custom or policy.  To the contrary, the undisputed record evidence shows that the PTDF medical staff

---

[9] The Plaintiff's testimony was not that the PTDF failed to change his bandages, but that his bandages were not changed as often as he would have liked.  While such evidence could conceivably support a claim for medical malpractice, it is not enough to establish a Constitutional violation.  *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (Stating that mere incidents of negligence or malpractice do not rise to the level of constitutional violations).

was trained and required to (1) render medical services within medically accepted standards of care, (2) comply with the Florida Model Jail Standards, including those standards pertaining to medical care, and (3) comply with JSO written policies and procedures in providing medical services to inmates. (Solano II ¶ 4). Because there is no evidence in the record which demonstrates a custom, policy, or widespread practice of being deliberately indifferent to the medical needs of inmates, nor is there evidence of a deliberate indifference to a need for such training, there can be no municipal liability and summary judgment should be granted.

## V.    CLAIMS AGAINST RUTHERFORD IN HIS INDIVIDUAL CAPACITY

### A.    No Constitutional Violation by Rutherford

Although the Plaintiff uses the term "individual capacity" on pages 8 and 32 of his Amended Complaint, he has asserted no basis, and has provided no proof to sustain any claim against Rutherford in his individual capacity. The record contains no evidence that Rutherford had any contact with Plaintiff, or that he played any direct role in the use of force against the Plaintiff, or in the provisions of healthcare to the Plaintiff. When asked to state each and every action Rutherford took or failed to take that violated the Plaintiff's Constitutional rights, the Plaintiff responded:

> Defendant John Rutherford failed to as Chief Administrative Agent, Supervisor for the Duval County Sheriff's Office provide adequate training, supervision, and advise Deputy C. Wilkie, K9 Officer (Badge No. 6052) and adequate advise, counsel, instruct Defendant Wilkie as to the limitations regarding use of force against suspect by the K9. Defendant Rutherford in action of law when as a supervisor failed to provide adequate training, counseling, instruction to Defendant Wilkie including proper tactics to be employed when capturing a suspect through use of K9.

(Plaintiff's Responses to Rutherford's Interrogatories, #21). *See also* (Jones p.106-107). These boilerplate assertions by the Plaintiff are not supported by any record evidence. To the contrary, the record evidence disproves the Plaintiff's assertions. (*See* Lewis, generally). These bare

claims against Rutherford are insufficient to support a claim of individual liability against Rutherford. *See Celotex*, 477 U.S. at 324.

Because no personal involvement of Rutherford is alleged, he can only be liable in a supervisory capacity. "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell,* 193 F.3d 1263, 1269 (11th Cir.1999) (internal quotation marks and citation omitted). Instead, supervisory liability under §1983 occurs only when:

> the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.

*Cottone v. Jenne*, 326 F.3d 1352, 1360-1361 (11th Cir. 2003)(internal cites and quotations omitted).

Because the undisputed evidence shows that Rutherford did not personally participate in the Plaintiff's arrest or provision of medical care, Rutherford's potential liability can only be due to a causal connection between Rutherford's actions and the alleged constitutional violation. *See Id*. The record contains no evidence regarding widespread abuse that Rutherford knew about, nor is there evidence that any of Rutherford's customs or policies resulted in the alleged constitutional violation. Thus, because the uncontested record facts fail to establish any Constitutional violation by Rutherford, he is entitled to summary judgment.

### B.    Rutherford is Entitled to Qualified Immunity

Additionally, Rutherford is entitled to qualified immunity for all claims against him in is individual capacity.  The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Pearson v. Callahan*, __ U.S.__, 129 S.Ct. 808, 815 (2009).   Because the Plaintiff cannot show that Rutherford violated clearly established law, Rutherford is entitled to qualified immunity and summary judgment should be entered in his favor.

## VI.    CONCLUSION

For the foregoing reasons, Defendant, Sheriff John Rutherford, requests that this Court enter an order granting his motion for summary judgment.

**RESPECTFULLY SUBMITTED**,

**OFFICE OF GENERAL COUNSEL**

/s/  Sean  B.  Granat
**SEAN B. GRANAT**
**ASSISTANT GENERAL COUNSEL**
Florida Bar No.:  0138411
Attorneys for the Defendant Rutherford
Office of General Counsel
117 West Duval Street, Suite 480
Jacksonville, Florida 32202
Telephone: (904) 630-1859
Facsimile: (904) 630-1316
Sgranat@coj.net

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 22, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to the following: Keith C. Tischler, attorney for Defendant King.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: Steven Lathel Jones, #J21218, Wakulla Correctional Institution Annex, 110 Melaleuca Drive, Crawfordville, Florida, 32327.

/S/ Sean B. Granat
**Sean B. Granat**